## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID AND DEBORAH CHILDS and WHITNEY COLE, <br><br> *Proposed Class Action Plaintiffs*, <br><br> v. <br><br> WESTMORELAND SANITARY LANDFILL LLC, <br><br> *Defendant* | C.A. No. 2:21-cv-1100 <br><br> (Removal from: The Court of Common Pleas of Westmoreland County, GD-2511 of 2021) <br><br> Electronically Filed |

## DEFENDANT WESTMORELAND SANITARY
## <u>LANDFILL LLC'S NOTICE OF REMOVAL</u>

## INTRODUCTION

Defendant Westmoreland Sanitary Landfill LLC ("WSL") owns one of the relatively few sites of its kind that has partnered with the federal Environmental Protection Agency ("EPA") to generate green energy.  Over the past year, WSL has invested millions of dollars in new technologies that allow WSL to separate methane from landfill gas at its facility in Belle Vernon, Pennsylvania.  Using this technology, WSL creates fuel for natural gas-powered trucks that collect waste throughout Western Pennsylvania.  Greenhouse gases are thus captured prior to release into the atmosphere and recycled into clean, productive use.  Moreover, participation in this voluntary EPA program—known as the Landfill Methane Outreach Program ("LMOP")— generates market-based credits that other companies can purchase to help meet their own federal environmental obligations.  Through initiatives like LMOP, the federal government achieves its goals of moving "the United States toward greater energy independence and security," deploying "greenhouse gas capture and storage options," and increasing "the production of clean renewable fuels.  110 P.L. 140 (Energy Independence and Security Act of 2007).

The EPA's LMOP is only part of the comprehensive federal regulatory framework from which this case arises.  For decades, the U.S. government has overseen state and local municipal solid waste landfills ("MSWLs").  In 1976, Congress enacted the Resource Conservation and Recovery Act to address "problems of waste disposal" that had become "national in scope and … necessitate[d] federal action," and to help "develop alternative energy sources … to reduce our dependence on such sources as petroleum products."  42 U.S.C. § 6901(a)(4), (d)(2). In 1994, the EPA approved Pennsylvania's scheme for permitting and monitoring MSWLs.  *See* 59 Fed. Reg. 29804.  That same year, the EPA introduced LMOP, in which WSL has participated since May 2020.

1

This case implicates all of these federal efforts.  At the heart of Plaintiffs' claims are allegations about WSL's practices for capturing and processing the landfill gas that is critical to WSL's participation in the EPA's Landfill Methane Outreach Program.  According to the named Plaintiffs, those practices violate Pennsylvania's EPA-approved standards for MSWLs and give rise to nuisance and negligence claims.  To remedy these practices, the Complaint seeks prospective injunctive relief to enforce federal regulatory standards.  Plaintiffs' allegations of compensatory damages also place—at least as pleaded—well over $5 million in controversy.

In multiple ways, Congress has ensured that a federal forum is available for this type of dispute.  Accordingly, WSL removes this lawsuit from the Court of Common Pleas of Westmoreland County on several grounds, each of which independently confers jurisdiction on this Court.

*First*, WSL removes this action pursuant to 28 U.S.C. § 1442(a)(1).  Through its participation in LMOP, Defendant WSL is "acting under" federal officers at EPA charged with developing alternative energy sources through the use of landfill gas.  Because Plaintiffs' claims relate to the manner of that participation and place at issue the nature and scope of WSL's federal duties, this action is independently removable under the federal officer statute.  *See In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457 (3d Cir. 2015) ("*Def. Ass'n*") (affirming removal under Section 1442(a)(1)).

*Second*, WSL removes this action pursuant to 28 U.S.C. § 1441 and Section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972.  Under RCRA, federal district courts "have jurisdiction, without regard to the amount in controversy or the citizenship of the parties," over actions—like this one—that seek to enforce "any permit, standard,

regulation, condition, requirement, prohibition, or order which has become effective pursuant to this Act."  42 U.S.C. § 6972(a).

*Third*, WSL removes this action pursuant to 28 U.S.C. §§ 1331 and 1441.  Though it purports to state claims under Pennsylvania nuisance and negligence law, the Complaint on its face also seeks injunctive relief "not inconsistent with the Defendant's state and federal regulatory obligations."  Complaint at p. 18 ¶ H.  In conjunction with the vast federal framework that governs Defendant's heavily regulated industry, that request raises a federal question within this Court's original jurisdiction.

*Fourth*, WSL removes this action pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d) and 1453 ("CAFA").  Plaintiffs purport to represent a multi-state class comprising thousands of owners and tenants who—as alleged, though disputed—incurred more than $5 million in diminished property value.  Although the claims are meritless, federal courts have removal jurisdiction over class actions of this type.  *See Dart Cherokee Basis Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014).

## NATURE OF REMOVED ACTION

1.      On July 19, 2021, WSL first received a copy of a Civil Complaint that Plaintiffs David Childs, Deborah Childs, and Whitney Cole filed in the Court of Common Pleas of Westmoreland County, Pennsylvania.  The Complaint alleges claims related to the operation of an MSWL in Belle Vernon, Pennsylvania.

2.      Plaintiffs purport to represent a putative class of "[a]ll owners/occupants and renters of residential property within one and a half miles (1.5) of the Landfill property boundary," also known as the "Class Area."  Complaint ¶¶ 11, 35 (attached as part of Exhibit A to the Declaration of W. Moorhead ("Moorhead Decl.") accompanying this Notice).  The

putative class allegedly comprises "approximately 4,200 separate residences within the Class Area." *Id*. ¶ 37.

3.      According to the Complaint, "materials deposited into the Landfill decompose and generate byproducts, including leachate and landfill gas, which generally consists of hydrogen sulfide, methane, carbon dioxide, and other various compounds" and, "when not managed properly," can emit an allegedly discernible odor. *Id*. ¶ 14.

4.      Plaintiffs cite alleged deficiencies in WSL's operation of its Belle Vernon site, which purportedly failed "to control noxious odor emissions … and prevent those odors from invading the homes and properties of the Plaintiffs and putative Class." *Id*. ¶ 17.

5.      The Complaint alleges that these deficiencies "were violations of the Solid Waste Management Act, 35 P.S. § 6018"; that the Pennsylvania Department of Environmental Protection ("PADEP") issued "Notices of Violations … for many of those infractions"; and that WSL consequently "entered into a Consent Order and Agreement with the PADEP on October 7, 2020" to address those alleged deficiencies. *Id*. ¶ 25(b)(xiv).

6.      Plaintiffs bring one count of private nuisance, one count of public nuisance, and one count of negligence under Pennsylvania common law. *Id*. ¶¶ 47-79.  On those bases, the Complaint seeks "[a]n award to the Plaintiffs and the Class Members for injunctive relief not inconsistent with the Defendant's state and federal regulatory obligations." *Id*. at p. 18 ¶ H.

7.      Plaintiffs also allege that each member of the class has "suffered damages to their properties" that "include, but are not limited to, the loss of use and enjoyment of their properties and the diminution of property value." *Id*. ¶ 76.

8.      The claims are removable on multiple, independent grounds.

## BASES FOR REMOVAL

9.      "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant … to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).

10.      To remove an action to federal court, the defendant need only "file in the district court of the United States for the district and division within which such action is pending a notice of removal … containing a short and plain statement of the grounds for removal," together with a copy of filings served upon the defendant.  28 U.S.C. § 1446(a).

11.      This "short and plain statement" of the grounds for removal "tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure."  *Dart*, 574 U.S. at 87.  The statement thus should plausibly allege that the action is removable, but "need not contain evidentiary submissions."  *Id*. at 84, 89.

## I.      This Action Is Removable Pursuant To The Federal Officer Statute.

12.      This Court has jurisdiction over Plaintiffs' claims, first, because the claims relate to actions taken under the direction of a federal officer.  *See* 28 U.S.C. § 1442(a)(1).

13.      Section 1442(a)(1) ensures that lawsuits relating to the actions of federal officers and operation of federal programs can proceed in federal court.  *See Def. Ass'n*, 790 F.3d at 466. Thus, "[u]nlike the general removal statute, the federal officer removal statute is to be 'broadly construed' in favor of a federal forum."  *Id*. at 466–67.  Congress's interest in permitting a federal forum for these cases was such that legislators provided for immediate appeal as a matter of right from decisions remanding cases removed pursuant to Section 1442(a)(1).  *See id*. at 465; *see also* 28 U.S.C. § 1447(d).

14.     Removal under the federal officer statute is proper where (1) the defendant is a "person" within the meaning of the statute; (2) the claims are based upon conduct taken while "acting under" the United States, its agencies, or its officers; (3) the claims are "for, or relating to" an act under color of federal office; and (4) the defendant can assert at least colorable "federal defenses."  *Def. Ass'n*, 790 F.3d at 467; *see also Golden v. N.J. Inst. of Tech.*, 934 F.3d 302 (3d Cir. 2019).  Each requirement is met in this case.

### A.     WSL is a "person."

15.     Any "person" acting under a federal officer may remove an action to federal court pursuant to Section 1442(a)(1).

16.     "Because the statute does not define 'person,' [courts] look to 1 U.S.C. § 1, which defines the term to 'include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.'"  *Def. Ass'n.*, 790 F.3d at 467.

17.     WSL is a Delaware limited liability corporation, with its principal place of business in Pennsylvania.  *See, e.g.,* Complaint ¶ 5.  It therefore qualifies as a person under the statute.  *Jacks v. Meridian Resource Co., LLC*,  701 F.3d 1224, 1227, n.3 (8th Cir. 2012) (holding that an LLC was a "person" within the meaning of Section 1442(a)(1)).

### B.     WSL is acting under a federal officer.

18.     "The 'acting under' requirement, like the federal removal statute overall, is to be liberally construed to cover actions that involve an effort to assist, or to help carry out, the federal supervisor's duties or tasks."  *Papp v. Fore-Kast Sales Co., Inc*., 842 F.3d 805, 812 (3d Cir. 2016) (marks and citation omitted).  The question is not whether the specific conduct alleged in the Complaint was itself "at the behest of a federal agency.  It is sufficient for the 'acting under' inquiry that the allegations are directed at the relationship between" the defendant and the federal government.  *Def. Ass'n*., 790 F.3d at 470.

6

19.     Here, as it relates to the allegations of the Complaint, WSL is acting under the Environmental Protection Agency, with which WSL partners in the creation of alternative energy as part of WSL's voluntary participation in LMOP.   *See In re MTBE Prods. Liab. Litig.*, 342 F. Supp. 2d 147 (S.D.N.Y. 2004) (permitting removal under Section 1442(a)(1) based on claims that defendant was acting under the EPA).

20.     LMOP is a voluntary program that the EPA created to ensure that the federal government meets its energy-based policy goals.  The program traces its origins to the Energy Policy Act of 2005, 109 P.L. 58 § 1501, and the Energy Independence and Security Act of 2007, 110 P.L. 140 § 200 (both codified in relevant part at 42 U.S.C. § 7545(o)).  Together, these laws created the federal government's Renewable Fuel Standard Program, which establishes a market for domestically produced green energy and green energy credits from various sources.

21.     Specifically, these federal laws require refiners or importers of fossil fuels to use a certain amount of renewable fuels.  *See* 40 C.F.R. § 80.1406.  Each refiner and importer has a specific "Renewable Volume Obligation"—the amount of renewable fuel that entity must use— that is individually calculated based on the amount of fossil fuels that the entity generates.

22.     To meet their federal Renewable Volume Obligations, refiners and importers must either blend renewable fuels into the petroleum-based fuels they generate, or purchase carbon credits from renewable fuel generation on the market.  The federal government's goal is to replace a certain amount of petroleum-based heating and transportation fuel with renewable fuels.  *See* 42 U.S.C. § 07545(o)(2)(A); *see also* Overview for Renewable Fuel Standard (Moorhead Decl. Ex. B).

23.     The federal government does not produce enough renewable fuel to meet all Renewable Volume Obligations.  Thus, to ensure that renewable fuels are available, the federal

government incentivizes or partners with private parties to generate the necessary renewable

fuels that refiners and importers use to meet their Renewable Volume Obligations.

24.     One way that the federal government does this is through the LMOP.

25.     An MSWL is a highly engineered system that ensures the responsible disposal of

solid waste.  *See generally* What is a Landfill? (Moorhead Decl. Ex. C).  As the waste breaks

down inside the disposal cell, it naturally produces what is known as landfill gas ("LFG").  LFG

contains methane, the key component of natural gas.  The EPA recognizes that "methane

emissions from [MSWLs] represent a lost opportunity to capture and use a significant energy

resource."  *See* Basic Information about Landfill Gas (Moorhead Decl. Ex. D).

26.     Accordingly, the EPA started LMOP as a way to partner with landfill owners and

operators to collect the methane in LFG for use as a renewable fuel.  The fuel generated from

LFG can be used as a renewable energy source for electricity generation, industrial heat

applications, or vehicle fuel.  The mission of LMOP is to "work cooperatively with industry

stakeholders and waste officials to reduce or avoid methane emissions from landfills by

encouraging the recovery and beneficial use of biogas generated from organic municipal solid

waste."  LMOP and Landfill Gas Energy in the United States at 2 (Moorhead Decl. Ex. E).

27.     This use not only captures a "significant energy resource" but also serves to assist

the federal government in meeting the objectives laid out in the Energy Policy Act of 2005 and

the Energy Security and Independence Act of 2007.  Fuels derived from LFG qualify as

renewable fuels under the Renewable Fuel Standard Program.  Refiners and importers of fossil

fuels can therefore use fuels derived from LFG to meet their Renewable Volume Obligation,

either by blending the landfill derived fuel into their fossil fuels, or by purchasing credits based

on the generation of LFG-derived fuel.  *See* Information about Renewable Fuel Standard for Landfill Gas Energy Projects (Moorhead Decl. Ex. F).

28.     At present, only about 20 percent of landfills in the United States participate in the LMOP.  *See* Project and Landfill Data by State (Moorhead Decl. Ex. G).  Those that do, however, assist the EPA in ensuring that the federal government meets its energy policy goals.

29.     WSL owns and operates one of those sites.  WSL collects the methane from the LFG generated at the Belle Vernon site at issue in this case for use as green fuel.  In doing so, WSL is acting under the EPA to generate vehicle fuel, thus helping both to reduce methane emissions, and to create the renewable fuel that must be available for refiners and importers to meet their obligations under the Renewable Fuel Standard Program.

**C.     Plaintiffs' claims relate to actions under color of federal office.**

30.     For removal pursuant to Section 1442(a)(1), the alleged conduct must "have been undertaken 'for or relating to' a federal office."  *Papp*, 842 F.3d at 813.  To satisfy this aspect of removal, "it is sufficient for there to be a 'connection' or 'association' between the act in question and the federal office."  *Def. Ass'n,* 790 F.3d at 471; *see also Papp*, 842 F.3d at 813 (noting that recent statutory amendments foster "a more permissive view" of this requirement).

31.     Allegations in the Complaint are inextricably connected to WSL's participation in the LMOP.  The extraction, collection, and processing of methane from LFG is central to the development of green fuel as part of LMOP.  Plaintiffs allege that WSL's operation of the Belle Vernon site is negligent and creates a nuisance under Pennsylvania state law.  But the very methods they challenge were undertaken with the guidance of the federal government and concern the means by which WSL achieves its LMOP goals.

32.     For instance, Plaintiffs allege that WSL has failed to install, maintain and operate an adequate landfill gas collection system; that it fails to properly monitor the Belle Vernon site;

that its cover practices are inadequate; that the equipment it uses is not appropriate, or is not appropriately maintained; and that WSL has failed to use "other odor mitigation and control techniques."  Complaint ¶¶ 15-18.

33.     But the same systems that Plaintiffs allege to be unlawful are designed in conjunction with federal standards disseminated through the LMOP.  Specifically, the EPA has developed a series of best practices to benefit both the EPA and industry stakeholders "as they work together to develop successful LFG energy projects."  EPA, *LFG Energy Project Development Handbook*, 1-1 (Moorhead Decl. Ex. H).

34.     These best practices provide guidance regarding, for instance, proper maintenance and operation of the leachate collection system, *id.* at 7-3 to 7-4; the proper materials to use in the LFG collection system, *id*. at 7-18; extraction wells and "special wastes," including construction and demolition waste, *id*. at 7-5; shallow control wells and how they can be used to control odors in LFG collection systems, *id*. at 7-9 to 7-10; and the use of system vacuums to achieve high gas collection efficiency and avoid odors and surface emissions, *id*. at 8-12.  These are the practices that Plaintiffs allege WSL is implementing in an unlawful way.

35.     WSL's practices in each of these respects are designed and implemented in furtherance of its goals to most efficiently capture LFG and create renewable energy to effectuate the goals of the LMOP.  Plaintiffs' allegation that WSL's practices constitute an unreasonable interference with public and private rights that outweighs any social utility and violates Pennsylvania common law cannot be litigated in isolation of participation in the LMOP.

36.     Plaintiffs' claims are thus "connected" and "associated" with actions taken under federal officers at the EPA.  *Def. Ass'n*, 790 F.3d at 471.

**D.      WSL raises colorable federal defenses to Plaintiffs' claims.**

37.      The final element for federal officer removal requires that the defendant identify a federal defense.  *Def. Ass'n*, 790 F.3d at 472.  This, too, is broadly construed in favor of federal jurisdiction.  *Id*. at 472–74.  The removing defendant need not prevail on the merits in order to remove; it need only show at least a partial federal defense that is "colorable."  *Id*. at 466.  WSL will assert several federal defenses, each of which independently supports removal.

38.      *First*, the "most common type of defense is a duty-based defense."  *Doe v. UPMC*, 2020 WL 4381675 at *6 (W.D. Pa. July 31, 2020).  In the context of federal officer removal, "a duty-based defense must be one that is 'based on a federal duty to act, or the lack of such a duty,' such as denying alleged violations of a federal duty."  *Id*. (quoting *Def. Ass'n*, 790 F.3d at 473-74).

39.      Plaintiffs here have put the scope of WSL's federal duties squarely at issue. Among other things, Plaintiffs allege that WSL has a duty to "abate the unreasonable interference with … their private property interests" and is acting in violation of that duty. Complaint ¶ 48.

40.      But WSL is complying both with applicable federal regulations and state regulations—including those made effective pursuant to RCRA and approved by the EPA.  WSL will establish that its lawful operations cannot unreasonably interfere with any public right where those operations comport with all governing federal regulations and federally approved state regulations.

41.      *Second*, the Complaint seeks prospective injunctive relief consistent with WSL's "federal regulatory obligations."  *Id*. at p. 18 ¶ H.  That, too, raises unique federal defenses.

42.      As a general matter, any request for injunctive relief consistent with "federal regulatory obligations" necessarily requires litigation over the nature and scope of those federal

obligations.  Any prospective relief that Plaintiffs seek will need to be tested against a complex

regulatory framework under federal law to ascertain whether the injunction would be consistent

with, contrary to, or beyond existing federal regulations.

43.     WSL's ongoing compliance with federal regulations separately renders Plaintiffs'

request for injunctive relief prudentially and/or constitutionally nonjusticiable.  *See Ailor v. City*

*of Maynardville, Tenn.*, 368 F.3d 587 (6th Cir. 2004) (upholding district court's decision that

plaintiff's suit was moot as defendant had already entered into an Agreed Order with the

regulator covering the activities at issue in the suit); *Grandson v. University of Minnesota*, 272

F.3d 568, 574 (8th Cir. 2001) (finding plaintiffs' request for injunctive relief moot as the

defendant had already entered into a consent order requiring the defendant to perform the same

actions requested in the complaint); *Pa. Gen. Energy Co., LLC v. Grant Twp.*, 2016 WL

5724437, at *6 (W.D. Pa. 2016) (indicating that certain requests for declaratory and injunctive

relief were nonjusticiable because they had already been achieved).

44.     *Third*, preemption constitutes a separate federal defense that supports removal

under Section 1442(a)(1).  *See Def. Ass'n*, 790 F.3d at 473–74 (affirming federal removal

jurisdiction under the federal officer statute in part because of a potential preemption defense).

45.     As relevant here, a consent order entered pursuant to RCRA can preempt a state

common law action for nuisance and trespass.  *Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1416 (4th

Cir. 1994).[1]  On a similar basis, a Pennsylvania court applied conflict preemption to dismiss

state-law claims for injunctive relief where the defendant had already agreed to remediate the

---

[1] The consent order at issue in *Feikema* was one the EPA entered into.  Here, PADEP
negotiated and signed the Consent Order with WSL.  In doing so, however, PADEP was
operating under the SWMA, which is Pennsylvania's program for implementing the RCRA.  *See
supra*.  State action taken under RCRA authorization has the same "force and effect" as action
taken by the EPA.  42 U.S.C. § 6926(d).

alleged nuisance emissions pursuant to a consent judgment.  *Ross v. USX Co.*, G.D. 17-008663 (Ct. Com. Pl. Allegheny Cty. Apr. 6, 2018) (sustaining preliminary objections where "Plaintiffs' request for injunctive relief would interfere with the Clean Air Act as implemented by the Allegheny County Health Department through the Consent Judgment").

46.    In March and October 2020, WSL entered into consent orders with PADEP concerning operation of the Belle Vernon site.  Complaint ¶ 25(b)(xiii–xiv).  These orders effectuate PADEP's interpretation of both the federal and state regulatory obligations that govern operation of Defendant's MSWL.  To the extent Plaintiffs now seek different injunctive relief to abate the same harms that these consent orders already are designed to remediate, conflict preemption will require dismissal of that claim.

47.    These federal defenses, as well as any additional defenses that Defendant may assert, satisfy the final requirement for federal officer removal pursuant to 28 U.S.C. § 1442(a)(1).  *See Def. Ass'n*, 790 F.3d at 473 (holding this element satisfied because defendant "claim[ed] that it was not violating the terms of" a federal statute); *see also Golden*, 934 F.3d at 311 (holding that defendant raised a colorable federal defense by denying that the records at issue "are federal records within the meaning of 44 U.S.C. § 3301").

## II.    RCRA Grants This Court Original Jurisdiction Over Plaintiffs' Claims.

48.    This Court also, independently, has original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1441(a) and 42 U.S.C. § 6972(a).

49.    The ability to remove under Section 1441(a) is not limited to general jurisdiction statutes like Section 1331 (federal question jurisdiction) and Section 1332 (diversity jurisdiction).  Any source of original federal jurisdiction can be a basis for removal, including specific grants of federal jurisdiction in statutes addressing specialized areas.  *See* Wright & Miller, 14C Fed. Prac. & Proc. Juris. § 3728 (Rev. 4th ed.) (observing that "there are several

additional special provisions authorizing removal for specific types of cases"); Moore's Federal Practice § 107.114 (same).

50.     RCRA grants federal district courts original jurisdiction over any suit to enforce "any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]."  42 U.S.C. § 6972(a).  The grant of jurisdiction is "without regard to the amount in controversy or the citizenship of the parties."  *Id*.

51.     Plaintiffs in this case seek to enforce regulations and standards made effective pursuant to RCRA.

52.     RCRA is a comprehensive waste management statute enacted to "promote improved solid waste management techniques" and "establish[] a viable Federal-State partnership to carry out the purposes of this Act."  42 U.S.C. § 6902(a)(1), (7).

53.     Among other things, RCRA mandates that States "adopt and implement a permit program" for solid waste disposal facilities that complies with federal regulations promulgated under RCRA.  *Id*. § 6945(c)(1)(A)-(B).  States seeking to benefit from RCRA must submit for EPA approval a proposed program for managing solid waste consistent with federal requirements.  *Id*. § 6495(c)(1)(C).

54.     Pennsylvania's program is found in the Commonwealth's Solid Waste Management Act ("SWMA"), 35 P.S. § 6018.101 *et seq*., and its implementing regulations. Pennsylvania submitted this program to the federal government in 1993, and the EPA administrator granted final approval on June 9, 1994.  *See* 59 Fed. Reg. 29807.  Pennsylvania's regulatory standards for MSWLs like the one at issue in this case became effective pursuant to RCRA upon the EPA's grant of approval.

55.     Plaintiffs here now seek to enforce those regulations, including by seeking relief based on their alleged violation.  For instance, the Complaint cites purported "inadequacies of the leachate collection system … relating to the berm and trench" around certain collection areas at WSL.  Complaint ¶ 25(b)(ii).  These purported inadequacies allegedly "violat[ed] … the Solid Waste Management Act, 35 P.S. § 6018" and helped cause the claimed nuisance.  *Id.* ¶ 25(b)(xiii).

56.     Such allegations arise from SWMA's standards for leachate collection systems, including berm size, that were approved by the EPA and became effective pursuant to RCRA. *See* 25 Pa. Code § 273.252(f) (regulating berm height for leachate collection); *see also* 59 Fed. Reg. 29806 (approving 25 Pa. Code §§ 273.251 – 273.258).

57.     On that basis alone, this Court has jurisdiction over Plaintiffs' claims pursuant to 42 U.S.C. § 6972(a).  It makes no difference that the Complaint does not state a claim under RCRA itself.  Consistent with RCRA's goal of establishing nationwide standards for waste management, the grant of jurisdiction in Section 6972 relates to the underlying factual allegations, not the specific cause of action that Plaintiffs choose.[2]  Because Plaintiffs allege violations of, and are seeking relief pursuant to, requirements that were made effective pursuant to RCRA, the Court has original jurisdiction, and the case may be removed to federal court.

---

[2] For instance, the Outer Continental Shelf Lands Act ("OCSLA") grants federal jurisdiction over any claim arising out of mineral production on the outer Continental Shelf.  *See* 43 U.S.C. § 1349.  On that basis, the Fifth Circuit affirmed removal of purely state-law claims without regard to the citizenship of the parties.  *In re Deepwater Horizon*, 745 F.3d 157, 162–164 & n.4 (5th Cir. 2014).  It also made no difference that the underlying complaint did not invoke OCSLA.  *Id.* at 163.  Removal was proper because the facts underlying plaintiffs' claims related to mineral production operations in the area covered by the grant of jurisdiction.  *Id.*

**III.    Plaintiffs' Complaint On Its Face Presents Federal Questions.**

58.    The Court separately has original jurisdiction over this case pursuant to 28 U.S.C.

§ 1331(a), which grants district courts "original jurisdiction of all civil actions arising under the

Constitution, laws or treaties of the United States."

59.    Section 1331 federal question jurisdiction exists whenever "plaintiffs' complaint

introduce[s] the federal question," even if the allegations are "unnecessary for the ultimate

disposition of the case" and it is "possible to decide the … dispute solely on state law precepts."

*Westmoreland Hospital Ass'n v. Blue Cross of Western Pennsylvania*, 605 F.2d 119, 123 (3d Cir.

1979) (affirming order denying remand after removal under Section 1331).  Once a federal

question appears on the face of the Complaint, this Court has original jurisdiction so long as it

"cannot say that as drafted and filed in the state court, the complaint did not require construction

of a federal statute for its disposition."  *Id*. at 124.

60.    As noted *supra*, Plaintiffs' Complaint on its face requests an injunction "not

inconsistent with the Defendant's state and federal regulatory obligations."  Complaint at p. 18

¶ H.

61.    Plaintiffs' request puts into question WSL's federal regulatory obligations.  The

parties will be disputing the nature and scope of WSL's obligations under federal law attendant

to any request for injunctive relief made in this case.  That is sufficient for federal question

jurisdiction under Section 1331—and for removal based thereon.  *See Westmoreland Hospital*,

605 F.2d at 123-24; *see also U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 389 (3d Cir.

2002) (federal question "must be disclosed on the face of the complaint, unaided by the answer or by the petition for removal.").[3]

## IV.    CAFA Also Grants Original Jurisdiction Over This Class Action.

62.    Independent of the other bases for removal, this Court has original jurisdiction over the action pursuant to CAFA, 28 U.S.C. § 1332(d).

63.    CAFA grants federal courts original jurisdiction where (1) a case is filed as a class action pursuant to Fed. R. Civ. P. 23 or a state's equivalent rule on behalf of a putative class numbering at least 100, 28 U.S.C. § 1332(d)(1)(B) & (d)(5)(B); (2) any member of the putative class "is a citizen of a State different from any defendant," *id.* § 1332(d)(2)(A); and (3) "the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs," *id.* § 1332(d)(2).[4]

64.    These requirements are "read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." *Dart*, 574 U.S. at 89.  Plaintiffs' Complaint satisfies each element for removal pursuant to CAFA.

### A.    This putative class action includes more than 100 named and unnamed plaintiffs.

65.    While WSL denies that class treatment is proper, CAFA removal depends only on whether the claims are initially pleaded as a proposed class action.  *See* 28 U.S.C. § 1332(d)(1)(B) (defining "class action" based on how the case is "filed"); *see also Lewis v.*

---

[3] To the extent this basis for removal—or any other basis presented in this Notice—does not encompass the Complaint in its entirety, this Court has original jurisdiction over the remainder of Plaintiffs' claims pursuant to the supplemental jurisdiction statute, 28 U.S.C. § 1367.

[4] While Congress codified in CAFA certain provisions that can impact whether a multi-state class action ultimately proceeds in federal court, those provisions are not jurisdictional.  *See* 28 U.S.C. §§ 1332(d)(3)-(4); *see also, e.g.*, *Visendi v. Bank of America N.A.*, 733 F.3d 863, 869 n.3 (9th Cir. 2013); *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 151 n.8 (3d Cir. 2009).

*Ford Motor Co.*, 685 F. Supp. 2d 557, 562-63 (W.D. Pa. 2010) (holding that CAFA permits removal before any decision on class certification).

66.     Here, Plaintiffs captioned their case as a "Proposed class action"; they seek relief "on behalf of all persons that the Court may determine to be appropriate for class certification"; and they invoke Pennsylvania's counterpart to Fed. R. Civ. P. 23.  *See* Complaint ¶ 35 (citing 231 Pa. Code § 1700).  That qualifies this case as a class action for purposes of CAFA removal. *See Lewis*, 685 F. Supp. 2d at 562-63 & n.9 (holding that a case originally filed in Pennsylvania state court as a class action pursuant to 231 Pa. Code § 1700 met the requirement of class action status for purposes of CAFA removal).

67.     The putative class also exceeds the minimum size necessary for CAFA removal. On its face, the Complaint asserts that the purported Class "includes thousands of members". Complaint ¶ 36(a).  Courts can determine that a proposed class includes at least 100 putative members if it is clear from the face of the Complaint.  *See Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 151 (3d Cir. 2009) (holding that the requirement of at least 100 members was met based on the complaint alone); *Visendi v. Bank of America N.A.*, 733 F.3d 863, 868 (9th Cir. 2013) (same).

### B.     The Parties are diverse.

68.     CAFA relaxes the ordinary rules of diversity to require only "minimally diverse" parties in the context of state-law class actions.  *Dart*, 574 U.S. at 85.  Minimal diversity exists where "any member" of the putative class of plaintiffs is either "a citizen of a State different from [the] defendant," or is "a citizen or subject of a foreign state and any defendant is a citizen of a 'State.'"  28 U.S.C. § 1332(d)(2)(A)–(B).  In assessing minimal diversity, courts consider the citizenship of *all* putative class members—both named and unnamed—as of the date the Complaint was filed.  *See id.* § 1332(d)(1)(D), (d)(7).

18

69.     WSL is a limited liability corporation.  *See* Complaint ¶ 5.  "Under CAFA, unincorporated associations—including limited liability companies—are citizens of the state under whose laws they are organized and of the state where their principal place of businesses is located."  *Bartels by and through Bartels v. Saber Healthcare Group, LLC*, 880 F.3d 668, n.1 (4th Cir. 2018) (citing 28 U.S.C. § 1332(d)(10)).

70.     WSL is incorporated under the laws of Delaware and maintains its principal place of business in the Commonwealth of Pennsylvania.  *See* Complaint ¶ 5.  It is therefore a citizen of Pennsylvania and Delaware, and minimal diversity exists if any single member of the putative class is a citizen of a State other than Pennsylvania or Delaware.

71.     There are multiple such putative class members.  The residential property within the Class Area consists of a mix of single family homes, apartment buildings, nursing homes, and mobile home parks, including properties owned by corporate entities from other States.

72.     As one example, UMH Properties is the owner of residential properties located within the Class Area, including—at least—the Rostraver Estates Mobile Home Park, located at 1198 Rostraver Road, as well as residential properties located at 239 Albee Drive, 308 Lauren Drive, and 624 Curt Drive.  *See* Moorhead Decl. Ex. I.

73.     Upon information and belief, UMH Properties is a publicly traded real estate investment trust that is incorporated in Maryland and maintains its principal place of business in New Jersey.  *See id*.  Under CAFA's test for citizenship, UMH Properties is thus a citizen of Maryland and New Jersey, making it diverse from WSL.  *See* 28 U.S.C. § 1332(d)(10).

74.     Similarly, Seneca Leandro View, LLC is the registered owner of residential property located at Map No. 26-02-09-0-333, also within the Class Area.  Upon information and

belief, Seneca Leandro View, LLC is incorporated in California and maintains its principal place of business there.  *See* Moorhead Decl. Ex. J.

75.     PPP Assets LLC is the registered owner of residential property located within the class area at Map No. 26-01-12-0-145.  Upon information and belief, PPP Assets LLC is incorporated in Florida and maintains its principal place of business in New York.  *See* Moorhead Decl. Ex. K.

76.     Moreover, the putative class comprising "all owners/occupants and renters" within the Class Area also captures individuals who may currently reside in Pennsylvania, but who remain citizens of another State or a foreign country.  Upon information and belief, property owners bordering WSL's Belle Vernon site include individuals with out-of-state addresses.

77.     The circumstances here establish the diversity necessary for CAFA removal because, by a preponderance of the evidence, at least one class member is not a citizen of Pennsylvania or Delaware.

**C.     The Complaint places in controversy a sum greater than $5 million.**

78.     This case also meets the final requirement for removal under CAFA—the amount in controversy.  For purposes of assessing this element, what matters is the amount put in controversy by the Complaint, not whether the Plaintiffs' claims are meritorious, which they are not.  *See Lewis*, 610 F. Supp. 2d at 486 (holding that claims satisfied CAFA's amount-in-controversy requirement where the estimated value of each plaintiff's claim multiplied by the number of class members exceeded $5 million).

79.     Moreover, in light of Congress' policy preference for removing class actions under CAFA, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart*, 574 U.S. at 89.  Where, as

here, a complaint does not specify an amount sought, "the defendant's amount-in-controversy allegation should be accepted."  *Id.* at 87.

80.     WSL concedes neither liability on Plaintiffs' claims nor the propriety of the relief they seek, and reserves all rights with respect to the defense of any alleged damages claim or supposed impact to the class at all.  Nevertheless, the Complaint on its face alleges diminution of value for more than 4,000 individual properties, as well as lost enjoyment for several thousands of individual putative class members.  Complaint ¶¶ 37, 76.  Purported damages of that magnitude are greater than the $5 million required in 28 U.S.C. § 1332(d)(2).

81.     The amount in controversy further increases in light of the other remedies identified in the Complaint.  Plaintiffs also seek economic damages to compensate for each putative class member's loss of use and enjoyment; punitive damages; and attorneys' fees, costs, and interest.  *See* Complaint at p. 17-18 ¶¶ D, E, G, and J.

82.     Each of those categories of awards should be considered in assessing CAFA's $5 million requirement.  *See Frederico*, 507 F.3d at 197 ("Plaintiff also seeks attorneys' fees, which can exceed six figures in a class action and are properly aggregated and considered for purposes of determining the amount in controversy under CAFA."); *id.* at 198–99 (punitive damages); *id.* at 197–98 (compensatory damages).

83.     Accordingly, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) and WSL meets all requirements for removal pursuant to CAFA.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

84.     WSL also meets all other requirements for removal.

85.     This Court has personal jurisdiction over all parties.

86.     Venue in this Court is proper because the state court action is pending within the Western District of Pennsylvania.  *See* 28 U.S.C. §§ 1441(a), 1453(b).

21

87.     WSL files this Notice of Removal in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division because the State court in which the action is pending, the Court of Common Pleas of Westmoreland County, is within this federal judicial district and division.

88.     This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

89.     WSL first learned of Plaintiffs' Complaint on July 19, 2021; removal is therefore timely under 28 U.S.C. § 1446(b).  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354–56 (1999).

90.     Copies of "all process, pleadings, orders, and other documents then on file in the State Court," are submitted herewith pursuant to 28 U.S.C. § 1446(a).

91.     Also in accordance with 28 U.S.C. § 1446(d), WSL will—promptly after filing this Notice—"give written notice thereof to all adverse parties" and "file a copy of the notice with the clerk" of the Court of Common Pleas of Westmoreland County.  A true and correct copy of the Notice to Plaintiff and Notice to the State Court of Filing of Notice of Removal will be filed with this Court as separate documents.

92.     Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of WSL's right to assert any and all defenses or objections to the Complaint, including but not limited to Plaintiffs' class allegations.  WSL denies the allegations of the Complaint and that Plaintiffs' claims have any merit.

93.     WSL respectfully reserves the right to submit briefing, argument, and additional evidence as necessary to support removal of this action.

Dated: August 18, 2021

Respectfully submitted,

/s/ *William J. Moorhead*

William J. Moorhead
Email: william.moorhead@bipc.com
Stanley Yorsz
Email: stanley.yorsz@bipc.com
Carl A. Moorhead
Email:carl.Moorhead@bipc.com
Buchanan Ingersoll & Rooney PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
Tel.:    (412) 562-8800
Fax:    (412) 562-1041

*Counsel for Defendant Westmoreland
Sanitary Landfill LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing document was transmitted by email for electronic service upon the counsel of record on August 18, 2021.

BUCHANAN INGERSOLL & ROONEY PC

By: */s/ William J. Moorhead*
         William J. Moorhead